**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

UNITED STATES OF AMERICA

v.

EZEQUIEL AGUIRRE-BENITEZ and
GAVINO RAMIREZ

CRIMINAL CASE NO.
3:16-cr-00009-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Ezequiel Aguirre-Benitez ("Aguirre-Benitez") and Gavino Ramirez ("Ramirez"), jointly referred to as "defendants," are charged with two counts of knowingly and intentionally possessing with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. [Doc. 1].[1] Defendants have filed a "Joint Motion to Suppress Wiretaps," [Doc. 36], and each defendant has filed a motion to suppress evidence obtained from a search of their respective residences, [Docs. 34 & 37].[2] The government opposes each of these motions, see [Docs. 41 & 42], and the parties filed supplemental briefs, [Docs. 52 &

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Aguirre-Benitez also filed a motion to suppress statements he made following his arrest, [Doc. 35]; however, after an evidentiary hearing held on March 22, 2017, Aguirre-Benitez withdrew his motion, [Doc. 50].

53].  For the reasons that follow, it is **RECOMMENDED** that defendants' "Joint Motion to Suppress Wiretaps," [Doc. 36], be **GRANTED IN PART** and **DENIED IN PART**[3] and that defendants' motions to suppress evidence from the searches of their residences, [Docs. 34 & 37], be **DENIED**.

## I.  FACTUAL BACKGROUND

### A.  <u>Federal Wiretaps</u>

In or about September 2013, federal and state law enforcement officers began investigating a drug trafficking organization operating in the Atlanta metropolitan area and elsewhere.  <u>See</u> [Doc. 41-1 at 38 ¶ 14].  In connection with that investigation the Drug Enforcement Administration ("DEA") received court authorization in the Northern District of Georgia to intercept wire and electronic communications over three cellular telephones ("federal wiretaps").  [Docs. 41-1, 41-2, & 41-3].

### 1.  *Wiretap for Target Telephone #1 (803-613-4084) ("TT#1")*

In connection with the investigation, on May 9, 2014, Assistant United States Attorney Lisa W. Tarvin submitted an "Application for Interception of Wire and Electronic Communications" to United States District Court Judge William S.

---

[3] Ramirez has filed a motion to withdraw his position in the joint motion to suppress with respect to the federal wiretaps and the federal consent wiretaps, [Doc. 54], acknowledging that he does not have standing to object to those wiretaps, [<u>id.</u> at 1-2], and his motion to withdraw is hereby **GRANTED**.  However, he maintains his position with respect to the remaining arguments in the joint motion.  [<u>Id.</u>].

Duffey, Jr.  See [Doc. 41-1 (all caps omitted)]; see also [Doc. 36-5].  An affidavit

signed by Nicholas S. Patten ("Officer Patten"), a task force officer with the Atlanta

Field Division Office of the DEA, was submitted in support of the application.[4]

---

[4] Officer Patten stated that prior to his employment with the DEA, he was assigned to the patrol and crime suppression units with the LaGrange Police Department for approximately five years; that he had been a DEA task force officer since 2011; that he was also a narcotics investigator with the Heard County Sheriff's Office located in Franklin, Georgia; and that he had received training in narcotics investigations and related legal matters through the DEA, the Georgia Regional Training Academy, the High Intensity Drug Trafficking Area's ("HIDTA") Atlanta, Georgia Training Facility, and the United States Attorney's Office for the Northern District of Georgia.  [Doc. 41-1 at 26 ¶ 1].  Officer Patten averred that he had conducted investigations into the unlawful possession, importation, possession with intent to distribute, and distribution of controlled substances and that through his experience and training, he had "become familiar with distribution methods used by narcotics traffickers, including, but not limited to, the methods of importing, packaging, transferring and distributing narcotics, the use of cellular telephones, pagers, the use of numerical codes, code words and other methods of avoiding detection by law enforcement, as well as the types and amounts of profits made by narcotics dealers and the methods, language and terms that are used to disguise the source and nature of the profits from their illegal narcotics dealing," and he also averred that he was "familiar with the ways in which drug traffickers operate their illegal enterprise, including, but not limited to, their use of cellular telephones for calls and electronic communications such as email and text messaging, and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions."  [Id. at 27 ¶ 2].  Officer Patten further stated that he was familiar with the ways drug traffickers conducted their business and the ways that they conceal, convert, transmit, and transport their drug proceeds.  [Id. at 28 ¶ 3].  Based on his training, experience, and numerous analyses of telephone billing records for telephones used by narcotics traffickers, Officer Patten stated that he knew that drug trafficking was often furthered by "utilizing multiple cellular phones, multiple insulated contacts, pre-paid cellular phones, and phones designated to be used only for 'incoming' or 'outgoing' calls," which he described as "compartmentalization," in order to avoid detection by law enforcement.  [Id. at 28-29 ¶ 4].  Officer Patten asserted that in his experience in wire and electronic intercept investigations,

[Doc. 41-1 at 26-88]; see also [Doc. 36-2]. The application sought to intercept communications from TT#1 (803-613-4084) "subscribed to in the name of Pepito Perez, 6780 Mableton Parkway, SE, Mableton, Georgia, and believed to be used by GUS LNU."[5] [Doc. 41-1 at 3-4]. Gus was subsequently determined to be defendant Aguirre-Benitez. [Doc. 41 at 19, 23; Doc. 42 at 6].

### a. Probable Cause for TT#1

In the affidavit submitted in support of the wiretap application for TT#1, Officer Patten stated that the goal of the investigation was to disrupt and dismantle the entire drug trafficking organization and that the wiretap order would help reveal the full nature, extent, and methods of the drug trafficking, importation, transportation, and distribution business; the administration, control, and management of the drug trafficking business; the identities and roles of accomplices, aiders, abettors, conspirators, and other participants, including sources of supply, in their illegal activities; the manner and means of distribution and transfer of illegal narcotics and the money collection resulting therefrom; the existence and location

---

"narcotics traffickers often attempt to thwart law enforcement efforts by frequently changing and fictitiously registering vehicles, telephones, and utility services in order to conceal their true identity." [Id. at 29 ¶ 6].

[5] The application also listed the following interceptees, who were expected to be intercepted over TT#1: "FNU LNU, a/k/a JULIO" ("Julio"), FNU LNU, a/k/a GUS, a/k/a Primo" ("Gus"), B.S., R.S., and FNU LNU, a/k/a MIRIN ("Mirin"). [Doc. 41-1 at 3 ¶ 2].

of drug records and drug proceeds; the location and source of resources used to finance the illegal activities; and the locations and instrumentalities used in furtherance of those activities. [Doc. 41-1 at 32-33 ¶ 11]. He then stated that the information contained in the affidavit was based on the "investigation, conversations intercepted through court-authorization, information provided by [other] agents," "information provided by confidential sources, information gathered by analysis of pen register, trap and trace, and telephone toll records, and [his] and other agents' training, experience and background as agents of the [DEA]." [Id. at 33 ¶ 12].

Officer Patten described in great detail the background investigation leading to the request for the wiretap order.[6] See [id. at 35-82 ¶¶ 14-85]. Specifically, the affidavit described the investigation of a drug trafficking organization operating in the Atlanta area and elsewhere that began in September of 2013 when information was obtained about Julio, who was determined to be a methamphetamine supplier in Mexico who "uses workers in the United States to deliver methamphetamine to his customers, including [Gus] and an individual known only as [Reyes]." [Id. at 35

---

[6] Officer Patten stated that he had not included every fact known to him regarding this investigation as he set forth only the facts essential to establish probable cause for an order securing authorization for the original interception of wire and electronic communications over TT#1. [Doc. 41-1 at 34 ¶ 12].

¶ 14]; see also [id. at 28 ¶ 19].[7]  Officer Patten averred that W.T., R.S., B.S., and C.H. were believed to have been methamphetamine customers of Julio, who had since been caught with drugs and/or arrested on state drug charges.  [Id. at 38 ¶ 19, 58 ¶ 53].  Officer Patten detailed a search of R.S.'s residence in January 2014, where agents seized a small quantity of methamphetamine, at which time R.S., who was cooperating with law enforcement, identified Gus as his source of supply and provided a telephone number (not TT#1) that Gus used to facilitate drug trafficking activities.  [Id. at 36 ¶ 15].  R.S. informed agents that he received pound quantities of methamphetamine from Gus approximately twice each month for six months in business parking lots or hotel rooms in Newnan, Georgia.  [Id. at 59 ¶ 54]; see also [id. at 46 ¶ 31].  Officer Patten stated that B.S. had provided information to law enforcement about Primo, a local methamphetamine distributor in the Atlanta area who worked for Julio, from whom she had purchased pound quantities of methamphetamine two to three times per week at different locations on South Cobb Drive in Smyrna, and Officer Patten averred that Primo and Gus were believed to be the same individual.[8]  [Id. at 36 ¶ 16, 60-61 ¶ 55].  Officer Patten explained that

_____

[7] In addition to being an associate of Julio, Gus was believed to have an association with Mirin, another Mexico-based drug distributor.  [Doc. 41-1 at 38 ¶ 19].

[8] At the time of the application, Officer Patten stated that R.S. and B.S. were no longer cooperating with law enforcement.  [Doc. 41-1 at 36 ¶¶ 15-16].  He averred

C.H. was arrested for a state probation violation and provided information about Reyes, from whom he would typically purchase ten ounces of methamphetamine approximately twice per month in business parking lots in Hapeville, Georgia. [Id. at 58 ¶ 53]. At the time of his arrest, he informed law enforcement that he owed Julio $4,500. [Id.].

Officer Patten described that in March of 2014, a DEA confidential source ("DEA CS"), who was developed through a state drug investigation, identified Gus as a methamphetamine distributer in the Atlanta area, who directs and coordinates the delivery of methamphetamine and collection of drug money through couriers in Columbus, Georgia, and other locations outside of the Atlanta area, and provided agents with Gus' telephone numbers, including TT#1.[9] [Id. at 37 ¶ 17, 50-51 ¶¶ 40-

_____

that based on toll records, it was believed that R.S. and B.S. had been in recent contact with Julio and Gus, but that those contacts were not made at the request of law enforcement and had not been reported to law enforcement. [Id. at 38-39 ¶ 19, 61-62 ¶ 56]. In particular, based on a toll analysis of TT#1, Officer Patten stated that between March 8 and April 2, 2014, and April 27 and April 29, 2014, TT#1, used by Gus, was in contact with a phone number believed to be associated with R.S. via wire communications on 6 occasions and via electronic communications on 18 occasions. [Id. at 45 ¶ 31]. And, between March 8 and March 24, 2014, TT#1 was in contact with 2 telephone numbers believed to be associated with B.S. on 39 occasions. [Id. at 61-62 ¶ 56].

[9] The DEA CS typically ordered one to four ounces of methamphetamine from Gus for each transaction, which was usually delivered that day or the next by a courier, except for two occasions when Gus delivered it himself. [Doc. 41-1 at 37 ¶ 17, 51 ¶ 41]. On February 24, 2014, Gus sent a text message to the DEA CS using TT#1 and identified TT#1 as the number through which the DEA CS could contact

41]. On April 2 and April 30, 2014, the DEA CS was used to make controlled buys of methamphetamine from Gus, which Officer Patten explained were arranged and conducted through wire and electronic communications over TT#1.[10] [Id. at 37 ¶ 18, 40-42 ¶¶ 21-24, 43-44 ¶¶ 26-29]. Also, in April of 2014, Officer Patten stated that HIDTA agents developed a confidential source ("HIDTA CS"), who was working

_____

him for future drug transactions. [Id. at 37 ¶ 17].

[10] In particular, Officer Patten stated that on April 2, 2014, the DEA CS contacted Gus using TT#1 to arrange a drug transaction for later that day, stating he/she had $1,400 to spend, and they agreed to meet at a Burger King restaurant in Austell, Georgia. [Doc. 41-1 at 40 ¶ 21]. After the DEA CS traveled to the wrong Burger King restaurant and exchanged several text messages with TT#1, the DEA CS arrived at the location, and shortly thereafter, two Hispanic men in a red Nissan Frontier arrived, parking next to the DEA CS's vehicle. [Id. at 40-41 ¶¶ 22-23]. The DEA CS then approached the driver of the Frontier and made the exchange, after which it was determined that the DEA CS received 79 grams of methamphetamine. [Id. at 41-42 ¶¶ 23-24]. The DEA CS stated that Gus was not at the transaction and that he/she did not recognize either of the two individuals in the Frontier. [Id. at 42 ¶ 24]. Aerial surveillance followed the Frontier after the exchange to a residence at 4860 Marsha Drive, Mableton, Georgia. [Id. at 42 n.4]. The DEA CS was then directed to contact Gus using TT#1 on April 16, 2014, to thank him "for the good quality product" and inform him that he/she would be contacting him soon for more. [Id. at 42 ¶ 25]. This call was confirmed through pen register data. [Id.]. On April 30, 2014, the DEA CS, at the instruction of law enforcement, contacted Gus using TT#1 to arrange a methamphetamine transaction, stating he/she had $3,000 to spend, and they agreed to meet at a Quik Trip gas station in Mableton, Georgia, later that day, at which time a Hispanic male arrived in a black Ford 150, and the DEA CS approached the driver and made the exchange, receiving 131 grams of methamphetamine. [Id. at 43 ¶¶ 26-28]. The DEA CS again did not know the courier sent by Gus. [Id. at 43 ¶ 28]. The Ford 150 was followed to a trailer park in Mableton, Georgia, and it was subsequently determined that the Ford 150 was registered to Gabriel Solis at 44 Winnstead Drive, Mableton, Georgia, as was the red Frontier. [Id. at 43-44 ¶¶ 27, 29].

for a drug organization, receiving instructions from Mirin in Mexico and delivering methamphetamine to customers in the Atlanta area. [Id. at 44 ¶ 30, 53 ¶ 48]. The HIDTA CS consented to agents intercepting communications over his/her telephones pursuant to a consensual wiretap. [Id.]. On April 30, 2014, a conversation between the HIDTA CS and Gus, using TT#1, was intercepted, whereby the HIDTA CS told Gus that Mirin had directed him/her to call, provided his number to contact, which was TT#1, and instructed him/her to "deliver 'work'" to Gus. [Id. at 44-45 ¶ 30, 53-54 ¶ 48]. As of the date of the application, Officer Patten affirmed that there had not been any other intercepted conversations between the HIDTA CS and Gus, nor had the HIDTA CS delivered any drugs to Gus. [Id. at 45 ¶ 30, 54 ¶ 48].[11]

Officer Patten detailed another confidential source, identified as GBI CS, who informed agents that Julio and Reyes were part of a drug trafficking organization that distributed methamphetamine in the Atlanta area and that customers ordered methamphetamine from Julio, who was in Mexico and employed Reyes to deliver the drugs in the Atlanta area. [Id. at 52 ¶ 44]. The GBI CS observed that the organization used "large sealed aluminum vegetable containers (cans) to conceal

---

[11] Officer Patten stated that agents involved in the investigation were still relying on the DEA CS and the HIDTA CS and both had been instructed to contact agents if they learned of new information or had any contact with Gus or any of his coconspirators. [Doc. 41-1 at 51 ¶ 42, 54 ¶ 48].

and distribute methamphetamine." [Id.]. Officer Patten stated that the GBI CS provided agents with Julio's telephone number in Mexico and introduced an undercover agent into the organization through Julio,[12] but that he/she did not have any information on Gus. [Id. at 52 ¶¶ 45-46].[13]

Officer Patten stated that the goal of monitoring TT#1 was to fully identify Gus, Julio, and their coconspirators and learn more about their drug trafficking activities in Mexico, Atlanta, and elsewhere; identify drug shipments being brought into the United States by this organization; identify existing and new phones being used by Gus, Julio, and coconspirators; learn more about the methods used by these individuals to receive shipments of methamphetamine and launder drug proceeds; and obtain information about the interaction, if any, between Julio, Gus, and Reyes. [Id. at 39-40 ¶ 20].

---

[12] Between November 22, 2013, and April 7, 2014, the undercover agent purchased methamphetamine from Reyes on four occasions, and Officer Patten affirmed that each transaction was arranged through telephones used by Reyes and that agents had identified twelve phones used by Reyes since November 2013. [Doc. 41-1 at 57 ¶ 50]. Since the undercover agent was introduced into the organization, he/she has only had contact with Julio and Reyes and did not know any information about Gus. [Id. at 57 ¶ 50].

[13] Officer Patten affirmed that since the GBI CS introduced an undercover agent into the organization, agents were no longer relying on him/her for information, except he/she was instructed to inform agents if he/she learned of any new information or had new contact with anyone within the organization. [Doc. 41-1 at 53 ¶ 47].

### b. Necessity for TT#1

Officer Patten explained that a wiretap was necessary because alternative investigative procedures had been tried and failed or appeared unlikely to succeed if attempted and because interception of wire and electronic communications was necessary to accomplish the objectives of the investigation, which he again listed. [Id. at 46-47 ¶ 32]; see also [id. at 47-48 ¶ 34]. With respect to the use of confidential sources and undercover agents, Officer Patten detailed the use of the DEA CS, the GBI CS, the HIDTA CS, and the uncover agent and information obtained from these individuals, [id. at 50-58 ¶¶ 39-51], and stated that while agents in this investigation had used and were continuing to use confidential sources and undercover agents, the use of such individuals was not likely to accomplish the investigation's goals because the information provided by the DEA CS, the GBI CS, and the HIDTA CS was not complete enough to identify and dismantle the organization, including learning the actual identities of Gus and Julio, [id. at 55 ¶ 49]; see also [id. at 51 ¶ 42, 54 ¶ 48], and the undercover agent would likely not be able to infiltrate the organization beyond Reyes, who was believed to be low ranking in the hierarchy of coconspirators associated with Julio, due to the fact that drug trafficking organizations compartmentalized their operations to protect the operation from competing traffickers and law enforcement, [id. at 57 ¶ 51].

Officer Patten then detailed the interviews with cooperating individuals, including C.H., R.S., and B.S., [id. at 58-62 ¶¶ 52-56], but averred that the information provided by these individuals was not "sufficient to meet the goals of th[e] investigation because their information [was] limited in scope and to low level conspirators, who, if arrested, would be easily replaced in the organization, which in turn could jeopardize the progress agents ha[d] thus far accomplished through the [undercover] agent," [id. at 62 ¶ 57]. Officer Patten stated that no interdiction, arrests, or seizures had been made of Julio, Gus, or their coconspirators, except as provided in the affidavit, because based on his experience and training, "narcotics traffickers operating in the United States often have family members who might be known by other members of the organization, and for fear of retaliation against family or friends, arrested persons often refuse to cooperate." [Id. at 63 ¶ 58].

With regard to physical surveillance, Officer Patten explained that numerous locations and vehicles had been identified through following leads from the investigation. [Id. at 64-66 ¶ 60]. He stated that 476 Lake Drive in Hapeville, Georgia and 718 Pineridge Drive in Forest Park, Georgia were discovered on December 11, 2013, and January 15, 2014, when agents followed Reyes back to these locations after he sold methamphetamine to the undercover agent, and that the following vehicles had been observed at these locations during spot checks: a black

2006 Jeep Grand Cherokee, a tan 2004 Honda Civic 4S, a gold 2007 Chevrolet Malibu LS, a black 2004 Chevrolet Trailblazer, a red 2006 Ford Mustang GT, a silver 2003 Cadillac CTS, a blue 1990 Nissan D21 truck, a silver 2002 Saturn SL1, and a red Nissan Frontier. [Id.].[14] As discussed earlier in the affidavit, Officer Patten also mentioned a black Ford 150 and listed the addresses of 4860 Marsha Drive SE and 44 Winnstead Drive, both in Mableton, Georgia, as being connected to the investigation. [Id. at 66 ¶ 60]. As of the date of the application, Officer Patten affirmed that "agents ha[d] [] been [un]able to determine the relevance of any of the locations, vehicles and/or individuals associated as registered owners listed [in the affidavit]," except as stated otherwise therein, and thus, he averred that this information obtained via physical surveillance was incomplete and unlikely to help the agents achieve the investigation's goals. [Id. at 66-67 ¶ 61]. Officer Patten also averred that the agents could not rely solely on physical surveillance to identify locations used by the drug trafficking organization as the subjects were conscious of law enforcement surveillance, as observed up to that point in the investigation. [Id. at 49 ¶ 36]; see also [id. at 51 ¶ 41, 67-68 ¶¶ 63-65].[15]

---

[14] Officer Patten explained that some of these vehicles were believed to be the ones used by the couriers to sell methamphetamine to the confidential sources and undercover agent. [Doc. 41-1 at 64-66 ¶ 60].

[15] In particular, Officer Patten detailed a previous transaction between the DEA CS and Gus, in which a vehicle slowly circled the DEA CS's vehicle prior to the

Officer Patten stated that tracking devices had not been used at that point in the investigation because vehicles used regularly by the subjects of the investigation had not yet been identified, except for the Nissan truck driven by Reyes on several occasions; it was "risky" for agents to install trackers on a target's vehicle; and installing trackers might jeopardize the covert nature of the investigation. [Id. at 68-69 ¶ 66]. And, he also stated that GPS data had not been used because "each of the telephones identified thus far ha[d] been serviced by Verizon, through which agents have had difficulty obtaining specific, reliable and/or helpful data in the past." [Id. at 69 ¶ 66]. Officer Patten averred that surveillance without a wiretap order would not provide sufficient evidence to meet the investigation's goals because, in his experience, "observed activity becomes clear when . . . viewed together with wiretaps" and those higher up in the drug organization "distance themselves from the narcotics and proceeds of the narcotics trafficking, leaving their

_____

arrival of the courier, and agents believed that the vehicle was sent by Gus to confirm that the DEA CS was alone. [Doc. 41-1 at 67 ¶ 63]. In addition, on January 16, 2014, after the undercover agent purchased methamphetamine from Reyes, agents attempted to follow Reyes, but he was believed to have conducted a "heat check by sitting in the Autozone parking lot to make sure that he was not under law enforcement surveillance," [id. at 67-68 ¶ 64], and again on March 5, 2014, after a transaction with the undercover agent, Reyes was observed driving the Nissan truck in tandem with another vehicle, a gold Malibu, which was believed to "have been a lookout for [Reyes] while he was conducting drug business with the [undercover] agent," [id. at 68 ¶ 65].

subordinates/couriers to drive vehicles and move narcotics and currency." [Id. at 69-70 ¶ 66]. He further averred that the use of physical surveillance alone in his experience had caused agents to react to false clues or divert resources and that misdirected surveillance could alert the subjects to the existence of an investigation. [Id. at 70 ¶ 66]. Officer Patten stated that search warrants and consent searches would not be feasible alternatives at that point in the investigation due to not having identified with certainty any locations or fully identified Gus, Julio, or other coconspirators, and thus, he believed they would be counterproductive to the ultimate goals of the investigation. [Id. at 71 ¶ 68, 72 ¶ 70, 73-75 ¶¶ 72-74].

Officer Patten pointed out that during the investigation agents had collected several consensual recorded conversations, but that "these recordings alone [were] not sufficient to meet the goals of this investigation because the only individuals implicated in the conversations [were] [Julio], [Reyes] and [Gus]." [Id. at 75-77 ¶ 75]. He reiterated his belief that if these individuals were arrested, the agents would likely never be able to identify the coconspirators and that the organization would replace them and the unidentified coconspirators would reorganize and protect themselves from law enforcement detection. [Id. at 76 ¶ 75]. Finally, although pen registers and toll records had been used in the investigation, Officer Patten stated that these investigative tools do not reveal the substance of conversations and could

not be used to fully identify the interceptees or capture the coordination of drug shipments smuggled from Mexico and that these investigative tools used in concert with intercepted conversations would allow agents to "specifically coordinate and direct surveillance within the general cell site area to identify and track the user(s) of the targeted telephones." [Id. at 76-77 ¶ 76]. Officer Patten also affirmed that trash pulls were not a readily available investigative tool because the relevance of the addresses identified was unknown and it would thus be risky to attempt trash pulls at that stage of the investigation, [id. at 78 ¶ 77], and that grand jury subpoenas would be similarly unhelpful as any grand jury inquiries "would [] likely [] drive the operation further underground," [id. at 78-79 ¶ 79].

As for financial investigations, Officer Patten stated that the ability to conduct a thorough financial investigation would be difficult until members of the organization were fully identified and their roles defined. [Id. at 82 ¶ 85]. In sum, Officer Patten stated that "'real time' interception of wire and electronic communications over TT#1 . . . [was] necessary to uncover the full scope of this drug conspiracy, and that normal investigative techniques, without the support of court-authorized interception of communications over [TT#1] [were] reasonably unlikely to succeed and [were], at times, too dangerous to employ." [Id. at 82 ¶ 86]. Judge

Duffey issued an order authorizing interception of wire and electronic communications over TT#1 on May 9, 2014. [Id. at 89-101].

## 2. *Wiretap for Target Telephone # 2 (470-328-3463) ("TT#2")*

On June 18, 2014, Special Assistant United States Attorney Katherine I. Terry ("Terry") submitted an "Application for Interception of Wire and Electronic Communications" to United States District Court Judge Timothy C. Batten, Sr. See [Doc. 41-2 (all caps omitted)]. An affidavit signed by Officer Patten was attached to the application seeking a second wiretap, see [id. at 27-103], to intercept communications on TT#2 (470-328-3463) "subscribed to in the name of Prepaid Customer, 17330 Preston Road, Dallas, Texas, and believed to be used by [Gus]."[16] [Id. at 4].

### a. Probable Cause for TT#2

In the affidavit submitted in support of the wiretap application for TT#2, Officer Patten reiterated the goals of the investigation, [id. at 34-35 ¶ 11]; see also [id. at 43-45 ¶ 19]; stated that the information contained in the affidavit was based on the

---

[16] The second application also listed the following interceptees, who were expected to be intercepted over TT#2: Julio, Gus, B.S., R.S., Mirin, "FNU LNU, a/k/a JUNIOR" ("Junior"), "FNU LNU, a/k/a UM-51" ("UM-51"), "FNU LNU, a/k/a UM-71, a/k/a UM-60" ("UM-60"), "FNU LNU, a/k/a UM-83" ("UM-83"), "FNU LNU, a/k/a UM-56" ("UM-56"), "FNU LNU, a/k/a UM-163, a/k/a UM-157" ("UM-157"), "FNU LNU, a/k/a UF-127" ("UF-127"), "FNU LNU, a/k/a UM-411" ("UM-411"), and "FNU LNU, a/k/a BARRY" ("Barry"). [Doc. 41-2 at 3-4].

investigation, court-authorized intercepted conversations, information provided by other agents and confidential sources and gathered from pen registers and telephone toll records, and his training and experience, [id. at 35 ¶ 12]; and identified the monitoring of TT#1 that began on May 9, 2014, and was terminated at the end of the authorized 30-day period, [id. at 37 ¶ 13].

Officer Patten provided the details of the investigation leading to the request for the first wiretap order that he had included in his first affidavit and new information learned by agents since the first application. In particular, he stated that in May 2014, the HIDTA CS's role in the organization changed, in that he/she began receiving instructions from an individual in the organization with whom he/she was in a romantic relationship,[17] and that as a result, the way in which the agents were using the HIDTA CS to further the investigation was altered and they were no longer intercepting his/her phone calls. [Id. at 40 ¶ 17, 67 ¶ 56].

Officer Patten explained that agents had learned that Junior, UM-60, UM-83, and UF-127 were believed to be methamphetamine customers or couriers of Gus; that UM-51 and UM-411 were believed to be sources of methamphetamine for Gus; that UM-56 was believed to be a supplier to Furcio, who was a possible source of

_____

[17] Officer Patten stated that the HIDTA CS had been "explicitly told . . . not to engage in a romantic relationship with any of the targets as a means to further the investigation." [Doc. 41-2 at 67 n.9].

18

supply for Gus; and that UM-157 was believed to be a courier for Furcio, but that at that time, the extent of their roles in the organization was unknown. [Id. at 42-43 ¶ 18]; see also [id. at 59-60 ¶ 42]. Officer Patten affirmed that agents had intercepted various communications through the court-authorized interception of TT#1 that indicated Gus was distributing methamphetamine to known and unknown customers, [id. at 45 ¶ 20]; see also [id. at 46-52 ¶¶ 20-30], but that after approximately May 20, 2014, there was a decline in the use of TT#1 as Gus continued to receive incoming text messages and phone calls, but the majority of these went unanswered, [id. at 52-53 ¶ 31]. Officer Patten stated that, based on information obtained from the DEA CS, who had provided law enforcement with Gus' telephone numbers, including TT#1 and TT#2, it was believed that Gus was now using TT#2 to conduct drug transactions, [id. at 53 ¶ 32, 62 ¶ 48], and that at the direction of law enforcement, the DEA CS called Gus on TT#2 on May 23, 2014, to arrange a methamphetamine transaction, and the exchange took place later that day at a Quik Trip gas station in Mableton, Georgia, at which time an unidentified male driving a Ford 150 parked next to the DEA CS's vehicle and the DEA CS approached the driver and exchanged $5,000 for a "Shin Ramyun Noodle Soup Bag with approximately 256.8 grams of methamphetamine inside," [id. at 54-55 ¶¶ 33-35]. Agents and aerial surveillance followed the Ford 150 back to the trailer park in

Mableton, Georgia.  [Id. at 55 ¶ 34].[18]  Based on a toll analysis, Officer Patten stated

that between April 29 and June 9, 2014, TT#2, used by Gus, was in contact with a

telephone number associated with R.S. on 61 occasions and with a telephone

number believed to be used by UM-83 on 16 occasions.  [Id. at 56-57 ¶ 37, 73 ¶ 64].

### b.     Necessity for TT#2

In the affidavit accompanying the application for the second wiretap, Officer

Patten outlined the investigative procedures that had been tried and failed or

reasonably appeared unlikely to succeed if tried.  [Id. at 57-97 ¶¶ 38-95].  The

explanations he provided were essentially the same as those detailed with respect

to the first wiretap.  [Id.].  However, Officer Patten noted that agents had identified

the following locations and vehicles through recent physical surveillance: 2678

Windy Hill Road in Marietta, Georgia; 34 Acacia Lane in Mableton, Georgia; a silver

Honda Accord; a black BMW; a white GMC truck; and another black Ford 150, [id.

at 75-77 ¶ 69], but that agents had still not been able to determine the relevance of

the locations or vehicles and their registered owners, [id. at 81 ¶ 71].  Officer Patten

also noted that the target subjects continued to be conscious of law enforcement

surveillance, as evidenced by Gus conducting a "heat check by sitting in the parking

---

[18] As discussed above, the Ford 150 was registered to Gabriel Solis at 44
Winnstead Drive in Mableton, Georgia, and the DEA CS identified the driver's
license photograph for Gabriel Solis as Gus.  [Doc. 41-2 at 55-56 ¶ 36].

lots [of two separate gas stations] to make sure that he was not under law enforcement surveillance." [Id. at 81-82 ¶ 73]. Officer Patten further noted that since the monitoring of TT#1, pole cameras were installed at 4860 Marsha Drive in Mableton, Georgia, but that no discernable criminal activity had been observed at that point in the investigation. [Id. at 83 ¶ 75]. He also stated that on June 10, 2014, agents performed a trash pull at this location, but that no evidence that would further the investigation was found, [id. at 92 ¶ 86], and that a financial investigation into Gabriel Solis, an identity suspected to have been used by Gus, had been initiated, [id. at 94 ¶ 89]. Judge Batten issued an order granting the application to intercept wire and electronic communications over TT#2 on June 18, 2014. [Id. at 104-16].

### 3. *Wiretap for Target Telephone # 3 (678-386-4616) ("TT#3")*

On November 10, 2014, Terry submitted an "Application for Interception of Wire and Electronic Communications" to Judge Batten. See [Doc. 41-3 (all caps omitted)]. Another affidavit signed by Officer Patten was submitted in support of this application for a third wiretap, see [id. at 27- 126 ¶¶ 1-109]; see also [Doc. 36-3], which sought to intercept communications on TT#3 (678-386-4616) subscribed to in

the name of "Prepaid Customer, 17330 Preston Road, Dallas, Texas," and believed to be used by Gus, [Doc. 41-3 at 5].[19]

### a. Probable Cause for TT#3

In the affidavit submitted in support of the wiretap application for TT#3, Officer Patten reiterated the goals of the investigation and stated the goals for monitoring TT#3, [id. at 35-36 ¶ 11]; see also [id. at 43-45 ¶ 18, 60-61 ¶ 30], and identified the monitoring of TT#1 that began on May 9, 2014, and was terminated at the end of the 30-day period, and TT#2 that began on June 18, 2014, and was terminated at the end of the authorized 30-day period, [id. at 38 ¶ 13].

Officer Patten provided the details of the investigation leading to the request for the first and second wiretap orders that he had included in his first two affidavits and new information learned by agents since the second application. In particular, he stated that, through the monitoring of court-authorized wiretaps of TT#1 and TT#2, agents had intercepted telephone and electronic communications between Gus and suspected suppliers, couriers, and customers regarding the distribution of

_____

[19] The third application also listed the following interceptees, who were expected to be intercepted over TT#3: Julio, "Gabriel SOLIS, a/k/a GUS, a/k/a Primo, a/k/a Ezequiel Aguirre" ("Gus"), B.S., R.S., Mirin, Junior, UM-51, UM-60, UM-83, UM-56, UM-157, UF-127, UM-411, Barry, M.B. a/k/a J.A. ("M.B."), F.M. a/k/a FLACO ("Flaco"), FNU LNU, a/k/a HUGO ("Hugo"), S.M. a/k/a S.C. ("S.M."), FNU LNU, a/k/a UF-57 ("UF-57"), J.F., J.M., FNU LNU, a/k/a ANGEL ("Angel"), T.F., FNU LNU, a/k/a Text User-546 ("Text User-546"), J.K., and FNU LNU, a/k/a FURCIO ("Furcio"). [Doc. 41-3 at 3-4].

drugs in the Atlanta area and elsewhere.[20]  [Id. at 39 ¶ 16].  Based on the investigation to date, Officer Patten averred that Gus was believed to be receiving methamphetamine from Julio in Mexico; that he had an association with Mirin, a distributor in Mexico; that he may also be receiving some of his supply from other identified and unidentified suppliers in the Atlanta area; and that some of his customers were believed to be "re-distributing the drugs to their own customers." [Id. at 40 ¶ 17].  In particular, Officer Patten stated that Furcio, UM-51, Flaco, and M.B. were believed to be sources of supply for Gus;[21] that UM-56 and UM-157 were suppliers to Furcio, who was a possible source of supply for Gus; and that Junior, UM-60, UM-83, UF-127, S.M., UF-57, J.M., T.F., Angel, Text User-546, and J.K. were intercepted over TT#1 and TT#2 and believed to be customers, couriers, or workers for Gus, but that the extent of their roles in the organization was still unknown at the time.  [Id. at 41-42 ¶ 17, 45 ¶ 19, 46 ¶ 20, 61 ¶ 32, 118-19 ¶ 98].

---

[20] Officer Patten stated that Julio, Reyes, and Mirin had not been intercepted over either TT#1 or TT#2.  [Doc. 41-3 at 40 ¶ 17, 45 ¶ 18].

[21] Flaco was identified by agents as F.M. via a local drug task force for which he was serving as a confidential informant.  [Doc. 41-3 at 41 ¶ 17, 44 ¶ 18].  Hugo was believed to be associated with Flaco and was intercepted over TT#2 on at least one occasion arranging for Gus to make a possible purchase.  [Id. at 43 ¶ 17]. Based on an intercepted conversation on June 19, 2014, between M.B., who, at that time, was working as a confidential informant for a local drug task force, and Gus, using TT#2, Officer Patten averred that M.B. was involved in making methamphetamine and supplying it to Gus and others.  [Id. at 46-47 ¶ 20].

Officer Patten reported that agents had intercepted text messages and phone calls through the court-authorized interception of TT#2 between Gus and J.K. on July 4, 2014, in which J.K. arranged to purchase drugs from Gus, [id. at 57-58 ¶ 26]; between Gus and R.S. on July 4 and July 5, 2014, in which they arranged for R.S. to purchase an undetermined amount of drugs at Motel 6 in Newnan, Georgia from Gus,[22] [id. at 52-53 ¶¶ 22-23] see also [id. at 41 ¶ 17, 83 ¶ 57]; between Gus and Text User-546 on July 13, 2014, in which they discussed what appeared to be a previously arranged meeting to purchase drugs, [id. at 56-57 ¶ 25]; and between Gus and S.M. on July 16, 2014, in which S.M. ordered drugs from Gus that were delivered by courier later that day, [id. at 55-56 ¶ 24].[23] Based on communications intercepted over TT#2, Officer Patten stated that agents conducted surveillance and observed

_____

[22] Officer Patten stated that based on surveillance set up at Motel 6 and prior interviews with R.S., it was believed that R.S. used a courier to then transport the drugs from the motel, so he would not be in possession of the drugs after the exchange. [Doc. 41-3 at 54 ¶ 23]. R.S. was stopped for traffic violations after leaving Motel 6, and he consented to a search of his vehicle, and his passenger, H.H., was observed attempting to discard a small amount of methamphetamine. [Id. at 55 ¶ 23]. H.H. was then arrested on state drug charges, and R.S. was arrested on an outstanding parole violation, and during an interview, R.S. "admitted that he had met that night with 'the guy [he] always deal[t] with.'" [Id.].

[23] Officer Patten stated that communications between Gus, using TT#2, and J.F. were intercepted, and that J.F. was arrested on August 15, 2014, by local law enforcement for violations of state law, at which time, J.F. named Gus as his source for methamphetamine and identified TT#2 as the number used to coordinate the transactions. [Doc. 41-2 at 83-84 ¶ 58].

what was believed to be the delivery of drugs to Gus' customers via courier, including S.M. and UF-57. [Id. at 89-94 ¶¶ 69-70].

Officer Patten stated that the DEA CS contacted Gus at law enforcement's direction on June 26, 2014, on TT#2 to arrange the purchase of methamphetamine, which was then delivered via an unidentified male courier to the DEA CS in a restaurant parking lot in Columbus, Georgia. [Id. at 68 ¶ 41]. This communication was intercepted over TT#2 and agents observed the exchange through surveillance. [Id.].

According to the affidavit, Gus was believed to be using TT#3 to facilitate his drug trafficking activities based on information that agents received from M.B. and a confidential source for a local drug task force in Cobb County, Georgia ("Cobb CS") and a common call analysis between TT#1, TT#2, and TT#3. [Id. at 45 ¶ 20]. In September of 2014, M.B., provided information that Gus was using a new telephone number–TT#3. [Id. at 45-46 ¶ 20]; see also [id. at 103-04 ¶ 81]. On October 24, 2014, the Cobb CS, who was a "distant relative" of Gus, was interviewed and informed agents that he/she knew Gus as Ezequiel Aguirre, Chapo, Victor, and Gabriel. [Id. at 43-44 ¶ 18, 48 ¶ 20, 65 ¶ 37]. The Cobb CS identified the driver's license photograph of Gabriel Solis as Ezequiel Aguirre and stated that he/she

spoke to him on TT#3 in June of 2014.[24]  [Id.].  Officer Patten stated that toll records

from TT#1, TT#2, and TT#3 show that TT#3 had been in contact with some of the

same target subjects that Gus contacted using TT#1 and TT#2, which was believed

to show that Gus was using TT#3 to facilitate his drug trafficking activities.[25]  [Id.

at 49-52 ¶ 21].

### b.    Necessity for TT#3

In the affidavit accompanying the application for the third wiretap, Officer

Patten detailed the investigative steps that had been taken and failed or reasonably

appeared unlikely to succeed if tried.  [Id. at 59-120 ¶¶ 28-100].  The explanations he

provided were essentially the same as those detailed with respect to the first and

second wiretaps.  [Id.].  However, since the interception of TT#2 ended on July 17,

2014, Office Patten stated that agents had continued to investigate Gus and his

coconspirators, including obtaining pen registers and physical surveillance, but that

---

[24] Officer Patten stated that toll records for TT#3 confirmed that the Cobb CS
was in contact with TT#3 in June 2014 and the Cobb CS confirmed to the agents that
Gus imports drugs from Mexico and uses multiple cell phones to conduct his drug
business.  [Doc. 41-3 at 48 ¶ 20].

[25] In particular, the toll records showed that R.S. was in contact with TT#1 on
20 occasions, TT#2 on 107 occasions, and TT#3 on 2 occasions, [Doc. 41-3 at 52 ¶ 22];
that S.M. was in contact with TT#1 on 62 occasions, TT#2 on 625 occasions, and
TT#3 on 181 occasions, [id. at 55 ¶ 24]; that Text User-546 was in contact with TT#1
on 33 occasions, TT#2 on 113 occasions, and TT#3 on 98 occasions, [id. at 56 ¶ 25];
and that J.K. was in contact with TT#1 on 135 occasions, TT#2 on 211 occasions, and
TT#3 on 278 occasions, [id. at 57 ¶ 26, 58 ¶ 27].

the information obtained was not sufficient to meet the goals of the investigation. [Id. at 62 ¶ 32, 109-10 ¶ 89]. In particular, with regard to physical surveillance, Officer Patten stated that since interception of TT#2 ended, several "'spot checks'" were conduct at the addresses that had been associated with Gus thus far in the investigation, but no new vehicles were observed and no one was seen outside of the locations. [Id. at 88-89 ¶ 67].

Officer Patten also noted additional evidence obtained that suggested that the targets were conscious of law enforcement surveillance and took steps to avoid detection, [id. at 94-100 ¶¶ 72-77], including that Gus had video surveillance at one of the suspected residences and was using at least six different phone numbers to conduct his drug business, [id. at 94-96 ¶¶ 73-74, 108 n.19]; that in an intercepted conversation, Gus asked S.M. if she knew who drove a red Buick Enclave that had been following his courier, and Officer Patten noted that this vehicle was used by an agent conducting surveillance, [id. at 96-97 ¶ 75]; and that after leaving a suspected drug transaction, J.F. "conducted numerous 'heat checks' by making frequent stops at various locations in an attempt to determine if he was being followed by law enforcement," [id. at 98 ¶ 76]. In addition, Officer Patten stated that after agents performed a trash pull at 4860 Marsha Drive SE in Mableton, Georgia, they "noticed a video surveillance camera installed near the mailbox" at this

location. [Id. at 111 ¶ 90]. Judge Batten issued an order granting the application to intercept wire and electronic communications over TT#3 on November 10, 2014. [Id. at 127-40].

**B.    Federal Consent Wiretaps**

During the course of the investigation, agents also obtained the consent of the HIDTA CS to intercept his/her wire and electronic communications over four of his/her telephones ("federal consent wiretaps"). See [Docs. 41-4, 41-5, 41-6, & 41-7]; see also [Doc. 36-4]. Agents submitted four applications to the United States District Court in the Northern District of Georgia to direct the carrier of the HIDTA CS's telephones, Sprint Corporation and Blackberry Corporation, to assist law enforcement in intercepting wire and electronic communications of the designated telephone. [Docs. 41-4, 41-5, 41-6, & 41-7]. The applications specified that the HIDTA CS consented to law enforcement's interception and recording of all his/her wire and electronic communications over that telephone. [Doc. 41-4 at 4 ¶ 4; Doc. 41-5 at 4 ¶ 4; Doc. 41-6 at 4 ¶ 4; Doc. 41-7 at 4 ¶ 4]. Further, the applications confirmed that the HIDTA CS had stated that he/she would not allow a third person to use the telephone. [Doc. 41-4 at 4 ¶ 4; Doc. 41-5 at 4 ¶ 4; Doc. 41-6 at 4 ¶ 4; Doc. 41-7 at 4 ¶ 4]. The applications also specified that 18 U.S.C. § 2511(2)(c) permitted law enforcement to intercept a communication if one of the parties to the

communication had given prior consent.  [Doc. 41-4 at 5 ¶ 5; Doc. 41-5 at 5 ¶ 5; Doc. 41-6 at 5 ¶ 5; Doc. 41-7 at 5 ¶ 5].  In the applications, law enforcement explained that providers of wire or electronic communication services are authorized to provide assistance if they are provided "a court order directing such assistance signed by the authorizing judge[.]"  [Doc. 41-4 at 6 ¶ 8; Doc. 41-5 at 6 ¶ 8; Doc. 41-6 at 6 ¶ 8; Doc. 41-7 at 6 ¶ 8 (citing 18 U.S.C. § 2511(2)(a)(ii))].  Orders granting the applications to intercept wire and electronic communications on the four telephone numbers used by the HIDTA CS were issued in April 2014.  [Doc. 41-4 at 15-18; Doc. 41-5 at 15-18; Doc. 41-6 at 15-18; Doc. 41-7 at 15-18].[26]

## C.  The June 25, 2015, Search of 4860 Marsha Drive Pursuant to the June 24, 2015, Search Warrant

On June 24, 2015, Officer Patten applied for and obtained a state search warrant for Aguirre-Benitez's residence located at 4860 Marsha Drive, Mableton, Georgia 30126.  [Doc. 42-1]; see also [Doc. 34-1; Doc. 52-1].  In an affidavit in support of the application for the search warrant, Officer Patten detailed the investigation that began in 2013 of a drug trafficking organization operating in the Atlanta area, and he explained that Aguirre-Benitez was believed to be a leader within the

_____

[26] Another sequence of wiretaps were obtained by orders of Superior Court Judges of Cobb County, which consisted of 37 wiretap orders ("Cobb County wiretaps") that were part of an investigation conducted by the Marietta-Cobb-Smyrna Organized Crime Task Force Narcotics Unit.  See [Doc. 36 at 2; Doc. 36-1; Doc. 41 at 4].

organization. [Doc. 42-1 at 7]. Officer Patten stated that agents learned of Aguirre-Benitez's illegal activities in part from the statements of cooperating coconspirators and defendants and that the investigation suggested that Aguirre-Benitez was storing evidence of his drug trafficking activities inside multiple residences. [Id. at 7-9]. In particular, Officer Patten affirmed that the search of a stash house[27] located at 6228 Evans Circle, Mableton, Georgia and believed to be operated by Aguirre-Benitez and an unidentified drug conspirator ("UM66")[28] resulted in the seizure of 4 assault rifles, 2 handguns, and 48 pounds of methamphetamine. [Id. at 7, 9].

In the affidavit, Officer Patten also described the connection between 4860 Marsha Drive and Aguirre-Benitez's drug trafficking activities. [Id. at 9-10]. On April 2, 2014, after an undercover agent purchased methamphetamine from a courier for Aguirre-Benitez, agents followed the courier back to 4860 Marsha Drive, [id. at 9], and beginning on May 30, 2014, agents monitored 4860 Marsha Drive through pole cameras and learned that Aguirre-Benitez was using this location as his residence, [id. at 10]. On May 10, 2014, and July 16, 2014, communications

---

[27] Officer Patten explained that the "term stash house is a common reference for a location that drug traffickers use to store illicit drugs, packaging material, proceeds from drug sales, records pertaining to the drug business, firearms and other items that support the illicit drug business." [Doc. 42-1 at 7].

[28] It appears from the parties' briefs and the affidavit submitted in support of the search warrant for Ramirez's residence that UM66 was subsequently determined to be defendant Ramirez. See [Doc. 37 at 1; Doc. 42-2 at 10].

related to Aguirre-Benitez's drug business were intercepted over TT#1 and TT#2, and geo-location data from these dates show the cell phones were located at 4860 Marsha Drive. [Id. at 9-10]. Agents intercepted text messages on November 23, 2014, between Aguirre-Benitez, using TT#3, and J.M., in which they set up a drug transaction for later that day, and during the intercepted communications, Aguirre-Benitez was located at 4860 Marsha Drive and left straight from this location to the location of the drug transaction, leading agents to believe he was storing methamphetamine at his residence on this date. [Id.]. On May 28, 2015, and June 17, 2015, a confidential source attempted to purchase methamphetamine from J.M., a regional distributor of methamphetamine on behalf of Aguirre-Benitez, but was informed that he had run out of his supply.[29] [Id. at 8]. Approximately one hour later, agents observed UM66 and Aguirre-Benitez drive to 34 Acacia Lane in Mableton, Georgia and remove two large bags from their vehicle and put the bags inside the location. [Id. at 9]. Thereafter, agents observed them drive to 4860 Marsha Drive, and Aguirre-Benitez went inside, and UM66 drove to a location associated with J.M.. [Id.]. On June 24, 2015, Cobb County Magistrate Judge Charles Chesbro signed a warrant, authorizing the search of 4860 Marsha Drive. [Id. at 2]. The search warrant was executed the following day. [Id. at 12].

---

[29] Agents learned of J.M. through physical surveillance of UM66. [Doc. 42-1 at 8].

**D.** **The June 25, 2015, Search of 91 Park Road Pursuant to the June 24, 2015, Search Warrant**

On June 24, 2015, Officer Patten also applied for and obtained a state search warrant for the residence located at 91 Park Road, Mableton, Georgia 30126. [Doc. 42-2]; see also [Doc. 37-1; Doc. 52-2]. Similar to the affidavit for the search of 4860 Marsha Drive, Officer Patten detailed the evidence showing that Aguirre-Benitez was the suspected leader of the drug trafficking organization under investigation. [Doc. 42-2 at 8]. He then described the connection between Aguirre-Benitez's drug trafficking activities and 91 Park Road. [Id. at 10-11]. Specifically, Officer Patten stated that agents had placed UM66 at 91 Park Road, which was believed to be used as his residence, before and after multiple suspected drug transactions. [Id. at 10-11]. On January 8, 2015, law enforcement was conducting physical surveillance on M.W., who was believed to be a regional distributor for Aguirre-Benitez, and observed him meet with Aguirre-Benitez at 369 Ashwood Avenue, Atlanta, Georgia, at which time he gave M.W. a large, red tool box and left. [Id. at 9]. Several hours later, M.W. was observed leaving the residence, and UM66 was also observed leaving this residence five minutes later. [Id.]. Agents followed UM66 to 34 Acacia Lane, where he stayed for 15 minutes, and then agents followed him to 91 Park Road. [Id.]. One hour later, agents followed UM66 back to 34 Acacia Lane, where he stayed for about 8 minutes, and then to 1977 Corner Road Powder Springs,

Georgia, where it was believed he delivered methamphetamine to J.M. [Id.]. Based on intercepted communications, surveillance was conducted on January 11, 2015, and UM66 was observed meeting with an individual and exchanging an item believed to be an unknown quantity of methamphetamine. [Id. at 10]. Agents then followed UM66 to 91 Park Road, and a pole camera was placed at this location on January 14, 2015. [Id.]. Officer Patten stated that since then agents had learned that this location was being used by UM66 as his residence. [Id.]. On May 28, 2015, UM66 was observed leaving 91 Park Road and traveling to 34 Acacia Lane and then driving to 9326 Flowering Trail in Jonesboro, Georgia, which was M.W.'s residence, who was believed to be a regional distributor for Aguirre-Benitez. [Id. at 9-10]. Agents followed UM66 back to 34 Acacia Lane and then back to 91 Park Road. [Id. at 10-11]. Approximately one hour later, agents again followed UM66 to 34 Acacia Lane, where he stayed for 8 minutes, and then to 1977 Corner Road, Powder Springs, Georgia, where it was believed he delivered methamphetamine to M.W. [Id. at 11]. On June 24, 2015, Cobb County Magistrate Judge Charles Chesbro also signed a warrant, authorizing the search of 91 Park Road. [Id. at 3]. The search warrant was executed the following day. [Id. at 12].

## II. DISCUSSION

Defendants have filed a "Joint Motion to Suppress Wiretaps." [Doc. 36 (all caps omitted)]. Aguirre-Benitez has filed a motion to suppress the search of his

residence, 4860 Marsha Drive, [Doc. 34], and Ramirez has also filed a motion to suppress the search of his residence, 91 Park Road, [Doc. 37].

A.   **Joint Motion to Suppress Wiretaps, [Doc. 36]**

    1.   *Statutory Framework for Intercepted Communications*

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized." United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007), adopted at *15. For example, pursuant to 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied upon by the applicant . . . including details as to the particular offense . . ., a particular description of . . . the type of communications sought to be intercepted, the identity of the person . . . whose communications are to be intercepted, and a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

United States v. Gonzalez Perez, 283 F. App'x 716, 720 (11th Cir. 2008) (per curiam) (unpublished) (alterations in original) (internal marks omitted) (quoting 18 U.S.C. § 2518(1)(b), (c)); see also United States v. Woodley, No. CR408-315, 2009 WL 3415214, at *1 (S.D. Ga. Oct. 22, 2009), adopted at *1.

Upon a proper application, a district judge may issue an *ex parte* order authorizing the interception of wire communications if:

the judge finds probable cause to believe that an individual is committing or has committed a qualifying offense; that particular communications concerning that offense will be obtained through such interception; and that the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person.

United States v. Duarte-Rosales, Criminal File No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008), adopted at *1 (citing 18 U.S.C. § 2518(3)(a), (b) and (d)); see also United States v. Robles, 283 F. App'x 726, 734-35 (11th Cir. 2008) (per curiam) (unpublished). "Probable cause for a wiretap is the same probable cause required for a search warrant," Duarte-Rosales, 2008 WL 140665, at *2 (citation omitted), and "[l]ike other types of warrants, probable cause must exist at the time surveillance is authorized," Flores, 2007 WL 2904109, at *21 (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "[A] wiretap order is presumed to be valid, and a defendant has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained." Id. at *22 (citations omitted). "This Court need merely determine whether the judge who signed the [order] had a substantial basis for concluding that probable cause existed." Duarte-Rosales, 2008 WL 140665, at *2 (citations omitted).

## 2.  *Request for Hearing*

Defendants request a <u>Franks</u> hearing, apparently contending that the affidavits in support of the wiretap applications omitted the prior federal consent wiretaps.  [Doc. 36 at 23-24].  However, in order to merit such a hearing, defendants must make "a substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978); <u>see also</u> <u>United States v. Wilson</u>, 314 F. App'x 239, 243 (11th Cir. 2009) (per curiam) (unpublished); <u>Flores</u>, 2007 WL 2904109, at *31.  Moreover, defendants must show "the challenged statement or omission was essential to the finding of probable cause."  <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1293 (11th Cir. 2006) (per curiam) (citing <u>Franks</u>, 438 U.S. at 155-56).  Defendants' attack "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  <u>Flores</u>, 2007 WL 2904109, at *32 (quoting <u>Franks</u>, 438 U.S. at 171-72).  "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  <u>Id.</u> (quoting <u>Franks</u>, 438 U.S. at 171-72).

Defendants argue that the affidavits submitted in support of the applications for wiretaps for TT#1, TT#2, and TT#3 "inexplicably do[] not notify the Court of the

prior [f]ederal [c]onsent [w]ire[taps]." [Doc. 36 at 23 (emphasis omitted)]. While the affidavits did not disclose the federal consent wiretaps in the sections entitled "Prior Applications for Interception," [Doc. 41-1 at 35 ¶ 13; Doc. 41-2 at 36-37 ¶ 13; Doc. 41-3 at 37-38 ¶ 13], the government correctly points out that "[a]ll three affidavits for the federal wiretaps discuss[ed] the 'HIDTA CS' and note[d] that '[t]he HIDTA CS ha[d] consented to agents intercepting communications over his/her telephones as part of his/her cooperation,'" [Doc. 41 at 21 (last alteration in original) (citations omitted)]; see also [Doc. 41-1 at 53 ¶ 48; Doc. 41-2 at 66 ¶ 56; Doc. 41-3 at 71 ¶ 47]. In fact, the affidavits discussed the conversation between the HIDTA CS and Gus, using TT#1, that was intercepted over the federal consensual wiretaps. [Doc. 41-1 at 53-54 ¶ 48; Doc. 41-2 at 66 ¶ 56; Doc. 41-3 at 72 ¶ 47]. "Because the [a]ffidavit[s] contain[] the information that [defendants] complain is missing, [they] have failed to make a substantial preliminary showing which justifies a *Franks* hearing on this basis." United States v. $255,427.15 in U.S. Currency, 841 F. Supp. 2d 1339, 1343 (S.D. Ga. 2012). Thus, their request for an evidentiary hearing is **DENIED**. See Flores, 2007 WL 2904109, at *32-33.

**3.** *Analysis*

Defendants seek to suppress evidence obtained as a result of various wiretaps obtained by the government. [Doc. 36]. Specifically, defendants seek to suppress

evidence arising from the federal consent wiretaps, asserting that the government failed to provide an adequate showing of necessity, [id. at 21], and failed to minimize non-pertinent or privileged calls, [id. at 24]. Defendants also seek to suppress evidence arising from the federal wiretaps, arguing that the government did not provide an adequate showing of necessity. [Id. at 22].[30] Lastly, defendants argue that because the wiretaps are subject to suppression under Title III, the good faith exception under United States v. Leon, 468 U.S. 897 (1984), does not apply. [Id. at 28].

### a. Standing

Only an "aggrieved person" may move to suppress wiretap evidence. 18 U.S.C. § 2518(10)(a). Title III defines an "aggrieved person" as a "person who was a party to any intercepted . . . communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11); see also Flores, 2007 WL 2904109, *2. Notably, to contest "the interception of communications, a defendant must establish that he was an 'aggrieved person.'" United States v. Degaule, 797 F. Supp. 2d 1332, 1352 n.14 (N.D. Ga. 2011) (citation omitted); United States v. Ortega-

---

[30] Defendants also move to suppress evidence obtained from the Cobb County wiretaps, [Doc. 36 at 17], but because the government has "agree[d] not to use interceptions obtained from the Cobb County wiretaps in the case at bar," [Doc. 41 at 4-5], the Court need not address defendants' arguments with respect to these wiretaps. Thus, it is **RECOMMENDED** that the defendants' motion to suppress evidence obtained from the Cobb County wiretaps be **GRANTED** as unopposed.

Estrada, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008), adopted at *1; see also Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980) (citations omitted) (noting that a defendant "bears the burden of proving . . . that he had a legitimate expectation of privacy"). The standard used to determine whether a defendant is an aggrieved person is coextensive with the standing requirements applied to Fourth Amendment suppression claims. See Alderman v. United States, 394 U.S. 165, 176 n.9 (1969); United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (citations omitted); United States v. Chaidez-Ontiveros, Criminal Case No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, *5 (N.D. Ga. Oct. 25, 2011), adopted by 2012 WL 984269, at *1 (N.D. Ga. Mar. 21, 2012) (citation omitted). In its response opposing the motion to suppress wiretaps, the government argued that "defendants have failed to make the threshold showing of standing to challenge the wiretap evidence from either the federal wiretaps or the federal consent wiretaps," [Doc. 41 at 7-8], and that "the Court should require both defendants to make a sufficient showing of standing prior to ruling on the substantive arguments in their motion," [id. at 8]. However, the government subsequently withdrew its standing argument with respect to Aguirre-Benitez, [Doc. 50], and Ramirez filed a motion to withdraw his motion to suppress with regard to the federal wiretaps and the federal consent

witeaps, [Doc. 54].[31] Thus, the Court need not address the government's argument regarding standing with respect to either defendant, and Ramirez's motion to withdraw, [id.], is **GRANTED**.

### b. Federal Consent Wiretaps

Aguirre-Benitez argues that the evidence obtained from the federal consent wiretaps should be suppressed because the applications do not comply with the requirements of Title III as there was no showing of necessity in the application, nor was there proper minimization. [Doc. 36 at 21-22, 24-28]. The government responds, and the Court agrees, that "the federal consent wiretaps are the consensual recordings of the [HIDTA] CS's conversations and electronic messages and, as such, are not governed by the necessity and minimization provisions of Title III." [Doc. 41 at 8].

Title III specifically provides that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the

---

[31] In particular, Ramirez states that he initially joined in the motion to suppress the federal wiretaps, the federal consent wiretaps, and the Cobb County wiretaps, [Doc. 54 at 1], but since the government has indicated it has no intention of using the Cobb County wiretaps in this case and that Ramirez was not intercepted on either the federal wiretaps or the federal consent wiretaps, Ramirez agrees with the government that he "currently does not have standing to object," and he therefore "withdraw[s] his position" with respect to the federal wiretaps and the federal consent wiretaps in the joint motion to suppress, [id. at 1-2].

parties to the communication has given prior consent to such interception."  18

U.S.C. § 2511(2)(c). In <u>United States v. Shields</u>, 675 F.2d 1152 (11th Cir. 1982), the

Eleventh Circuit found that § 2511(2)(c)'s exception to Title III applies to a law

enforcement informant who consents to recording his private conversations with a

defendant.  <u>Id.</u> at 1157; <u>see also</u> <u>United States v. Apple</u>, 915 F.2d 899, 907 n.16 (4th

Cir. 1990) (citing 18 U.S.C. § 2511(2)(c)) ("Consensual interceptions of

communications are not covered under Title III."); <u>United States v. Craig</u>, 573 F.2d

455, 479–80 (7th Cir. 1977) (noting that "consensual interceptions are significantly

different from non-consensual interceptions" and there is "nothing in [Title III of the

Omnibus Crime Control and Safe Streets] Act or its legislative history [that]

indicates that the recordings of consensual interceptions were intended by Congress

to be subject to 18 U.S.C. § 2518(8)(a)").

It is undisputed that the federal consent wiretaps were obtained with the

consent of the HIDTA CS, a party to the communications, and consequently, these

consensually recorded communications were not subject to the requirements of Title

III.  Accordingly, the government was not required to show necessity for the

consensual wiretaps.  Similarly, the government was not required to comply with

the minimization requirements under Title III for non-consensual recordings.

However, as the government points out, in the applications to the court, the federal

consent wiretaps noted that the HIDTA CS had agreed not to permit the use of the telephone by third parties. [Doc. 41 at 10; Doc. 41-4 at 4 ¶ 4; Doc. 41-5 at 4 ¶ 4; Doc. 41-6 at 4 ¶ 4; Doc. 41-7 at 4 ¶ 4]. Aguirre-Benitez has not identified any communications that were intercepted via the federal consent wiretaps to which the HIDTA CS was not a party, and therefore, has not stated any basis for suppression of any communications recorded pursuant to the federal consent wiretaps. Accordingly, it is **RECOMMENDED** that Aguirre-Benitez's motion to suppress be **DENIED** with respect to the federal consent wiretaps, and the remainder of the Court's analysis will focus exclusively on the challenged federal wiretaps which are subject to the requirements of Title III.[32]

### c.    Necessity

"Pursuant to 18 U.S.C. § 2518, court-ordered electronic surveillance is prohibited unless the government demonstrates the necessity of such techniques." Wilson, 314 F. App'x at 243 (citing United States v. Carrazana, 921 F.2d 1557, 1565 (11th Cir. 1991)). "This statute requires that wiretap applications include a 'full and complete statement as to whether or not other investigative procedures have been

---

[32] The government argues that "even if this Court were to find that the federal consent wiretaps were deficient, the evidence gathered should not be suppressed because law enforcement acted with good faith when relying on a court order." [Doc. 41 at 11]. However, the Court need not reach the good faith argument since Aguirre-Benitez has not identified any basis for suppression of the federal consent wiretaps.

tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .'" <u>United States v. Collins</u>, 300 F. App'x 663, 666 (11th Cir. 2008) (unpublished) (alteration in original) (quoting 18 U.S.C. § 2518(1)(c)); <u>see also</u> <u>Wilson</u>, 314 F. App'x at 243. "The purpose of this statute is to ensure that wiretapping is not resorted to in situations in which traditional investigative techniques would suffice to expose the crime."[33] <u>Collins</u>, 300 F. App'x at 666 (footnote omitted). "'The affidavit need not show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" <u>Id.</u> (quoting <u>United States v. Van Horn</u>, 789 F.2d 1492, 1496 (11th Cir. 1986)). "The district court is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in a practical and commonsense fashion." <u>United States v. Newsome</u>, No. CR 108-062, 2008 WL 4820257, at *3 (S.D. Ga. Nov. 4, 2008), adopted at *1 (citation and internal marks omitted); <u>see also</u> <u>United States v. Ashley</u>, 876 F.2d 1069, 1073 (1st Cir. 1989) (citation omitted) ("The government affidavit is adequate if it satisfies the burden that it indicate a

---

[33] "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." <u>Collins</u>, 300 F. App'x at 666 n.2.

'reasonable likelihood' that alternative techniques would fail to expose the crime.");

Flores, 2007 WL 2904109, at *27 (citations omitted).

"Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow." United States v. Hammond, No. 2:10-cr-0007-JMS-CMM, 2011 WL 201497, at *5 (S.D. Ind. Jan. 18, 2011). "Congress wanted to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation." Id. (citation and internal marks omitted); see also United States v. Giordano, 416 U.S. 505, 515 (1974). Therefore, "the necessity hurdle is not great." Hammond, 2011 WL 201497, at *5 (citations and internal marks omitted).

Aguirre-Benitez asserts that none of the federal wiretap affidavits fulfilled the "necessity" requirement for a wiretap order because they "employed a 'one size fits all' analysis from wiretap applications used in typical drug wiretap investigations, offering no explanation of why a wiretap was necessary in this case when wiretaps have never been used before in similar cases, and simply concealing the fact that the government had already used a number of conventional techniques with success in this very case." [Doc. 36 at 16]. The government responds that the affidavits for the federal wiretaps discussed the goals of the investigation, the difficulties encountered therein, and the law enforcement techniques attempted prior to seeking the federal wiretaps and "explained why traditional techniques were inadequate to successfully

investigate and prosecute a sophisticated drug trafficking organization." [Doc. 41 at 16-20]. For the reasons that follow, the Court finds that the government satisfied the necessity requirement of Title III with respect to the federal wiretaps.

First, investigative goals are relevant in the necessity analysis. As the government correctly contends, [id. at 16], the Eleventh Circuit and other courts have cited investigation objectives in evaluating the necessity requirement, see United States v. Allen, 274 F. App'x 811, 816 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted) ("[T]he government's ultimate objective and the traditional methods' usefulness to that objective are important to the necessity inquiry."); Van Horn, 789 F.2d at 1497 (noting that "it [was] obvious that the government was not seeking to catch one or two small vessels with marijuana, but to expose the entire conspiracy"); Flores, 2007 WL 2904109, at *5 (citation omitted) ("The necessity of a wiretap order is evaluated in light of the scope of the goals and course of the investigation."); see also United States v. Lopez, 300 F.3d 46, 53-54 (1st Cir. 2002) (citation omitted) (finding the necessity requirement satisfied where the affidavit demonstrated that "the traditional techniques employed by the DEA over the course of several months had failed to establish the identity of some conspirators, particularly those at the top of the distribution chain"); United States v. Diaz, 176 F.3d 52, 110-11 (2d Cir. 1999) (noting necessity for wiretap was shown

because traditional techniques were not adequate to reveal sources of drug supply and location of drug proceeds); United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990) (citations omitted) ("We have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators."); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) (citation and internal marks omitted) (noting "a court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope"). The affidavits for the federal wiretaps specified that the investigation aimed to dismantle the entire drug trafficking organization, including ascertaining: (a) the full nature, extent and methods of the drug trafficking, importation, transportation, and distribution business; (b) the administration, control, and management of the drug trafficking business; (c) the identities and roles of accomplices, including the sources of supply; (d) the manner and means of distribution of the drugs, as well the collection of the profits; (e) the existence and location of drug records and proceeds; (f) the location and source of resources used to finance the illegal activities; and (g) the location and instrumentalities used to further these activities. See [Doc. 41-1 at 32 ¶ 11, 46-47 ¶ 32; Doc. 41-2 at 34 ¶ 11, 57 ¶ 38; Doc. 41-3 at 35 ¶ 11, 59 ¶ 28].

After setting forth these goals, the affidavits for the federal wiretaps described the traditional investigative techniques used by the agents during the investigation, some of which were helpful and some of which were not. [Doc. 41-1 at 50-82 ¶¶ 39-85; Doc. 41-2 at 61-97 ¶¶ 46-95; Doc. 41-3 at 64-120 ¶¶ 36-100]. In particular, the affidavits discussed the agents' use of or inability to use traditional law enforcement techniques such as confidential sources and undercover agents, cooperating defendants, physical surveillance, tracking devices and GPS data, search warrants and consent searches, consensual recordings, pen registers and telephone toll records, trash pulls, grand jury subpoenas, and financial investigations. [Doc. 41-1 at 50-82 ¶¶ 39-85; Doc. 41-2 at 61-97 ¶¶ 46-95; Doc. 41-3 at 64-120 ¶¶ 36-100]. The affidavits described how these particular investigative techniques were employed in the investigation with some success, but also explained that they were insufficient to identify all of the members of the organization, the organization's sources of supply for drugs, supervisors and bosses, the customers, or the techniques the organization used to import and distribute the drugs and collect the drug proceeds. [Doc. 41-1 at 50-82 ¶¶ 39-85; Doc. 41-2 at 61-97 ¶¶ 46-95; Doc. 41-3 at 64-120 ¶¶ 36-100].

Aguirre-Benitez contends that "the government cannot satisfy its obligation under Title III simply by reciting boilerplate allegations about techniques, such as

physical surveillance, which obviously are of limited or no utility in the specific kind of investigation at issue, nor by making undifferentiated assertions about the inherent limitations of other techniques in proving criminal responsibility, such as pen registers, which necessarily would pertain to all cases." [Doc. 36 at 16]. However, "[n]othing in the law requires that the traditional methods be entirely useless or that the district court force the government to redefine its objectives." United States v. Booker, Criminal File No. 1:11-CR-255-TWT, 2013 WL 2468694, at *14 (N.D. Ga. June 7, 2013), adopted at *1 (citations and internal marks omitted); see also Allen, 274 F. App'x at 816; United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000) (citations omitted) (providing that "the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap"); United States v. Kelley, Criminal No. 08-00327-CG, 2009 WL 2589086, at *2 (S.D. Ala. Aug. 17, 2009) (citations and internal marks omitted) ("This circuit has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members.").

Moreover, although an affidavit supporting a wiretap application "must show with specificity why in *this particular investigation* ordinary means of investigation

will fail," Carrazana, 921 F.2d at 1565 (citations and internal marks omitted), an affidavit meets the necessity requirement despite the presence of commonly-employed language as long as it is "sufficiently specific and do[es] not constitute 'boiler-plate rationales,'" Degaule, 797 F. Supp. 2d at 1359. Here, the affidavits "[i]nclude[] more than mere general declarations and conclusory statements, [and] . . . instead incorporate[] detailed facts and supporting conclusions that satisfy the predicates of 18 U.S.C. § 2518(c)." United States v. Murdock, No. CR410-160, 2011 WL 43503, at *1 (S.D. Ga. Jan. 6, 2011); see also Degaule, 797 F. Supp. 2d at 1360 (citation omitted).

Indeed, as the government points out, the affidavits explained that the confidential sources had provided some valuable information regarding the drug trafficking organization. [Doc. 41 at 19]. For example, the DEA CS provided telephone numbers used by Gus, including TT#1 and TT#2. [Doc. 41-1 at 50 ¶ 41; Doc. 41-2 at 62 ¶ 48; Doc. 41-3 at 67 ¶ 39]. However, the affidavits explained that use of these confidential sources would not achieve all the goals of the investigation, including because the DEA CS could not "identify conspirators and their activities beyond ordering and receiving methamphetamine from [Gus] and his couriers." [Doc. 41-1 at 51 ¶ 42; Doc. 41-2 at 64 ¶ 50; Doc. 41-3 at 69 ¶ 43].

Similarly, the affidavits discussed agents' attempts to conduct surveillance on members of the drug trafficking organization, listing the specific locations and vehicles agents observed during this investigation. [Doc. 41-1 at 64-66 ¶ 60; Doc. 41-2 at 75-81 ¶¶ 69-70; Doc. 41-3 at 87-94 ¶¶ 64-70]. However, law enforcement agents were not able to determine the relevance of all the locations and vehicles, and such incomplete information could not achieve the goals of dismantling and prosecuting the members of the network/organization. [Doc. 41-1 at 66-67 ¶ 61; Doc. 41-2 at 81 ¶ 71; Doc. 41-3 at 94 ¶ 71]. Moreover, the affidavits explained that despite agents' attempts to conduct physical surveillance, targets were actively attempting to circumvent law enforcement, including circling locations prior to meetings, traveling in tandem with other vehicles, and stopping periodically to determine if anyone was following. [Doc. 41-1 at 67-68 ¶¶ 63-65; Doc. 41-2 at 81-82 ¶¶ 73-74; Doc. 41-3 at 94-100 ¶¶ 72-77]. As the government correctly contends, "[t]hese descriptions are of specific events that occurred and specific information learned during this investigation, not 'boiler plate' language." [Doc. 41 at 20].[34] In view of these specific

---

[34] Aguirre-Benitez argues that the affidavit for TT#3 failed to comply with the Title III requirement to disclose all previous applications for authorization to intercept wire communications involving any of the same persons, facilities or places specified in the application because it "completely fail[ed] to notify the Court of the existence of any of the Cobb County Wires." [Doc. 36 at 22 (citation omitted)]. However, the government correctly points out that the affidavit for TT#3 disclosed the wiretap investigation in Cobb County and explained that TT#1 was a common telephone number between the Cobb County investigation and the federal

statements, the fact that some of the reasons that traditional investigative techniques would not work may apply to other investigations, "will not negate a finding of necessity [because] the affidavit[s], as a whole, allege[] sufficient facts demonstrating necessity." Torres, 908 F.2d at 1423 (citations omitted). Accordingly, the Court rejects Aguirre-Benitez's arguments, and "finds that the government met the necessity requirements of 18 U.S.C. § 2518 in its application[s] for [] wiretap[s]." Kelley, 2009 WL 2589086, at *3; see also United States v. Olmedo, 552 F. Supp. 2d 1347, 1363 (S.D. Fla. 2008), adopted at 1350 (finding affidavits submitted in support of wiretaps were "more than sufficient to satisfy Title III's necessity requirement" as they "detailed the steps that law enforcement agents took, or considered taking, during their investigation of the [] drug trafficking organization," including describing the "techniques utilized–two confidential informants, consensual monitoring of telephone conversations, toll records, pen registers and trap and trace devices, and physical surveillance"–and "other traditional investigative techniques–grand jury subpoenas, interviews, and search warrants–[that] were not reasonably likely to succeed").

---

investigation, but at that time, agents did not believe Aguirre-Benitez had been intercepted in the Cobb County investigation. [Doc. 41 at 23-24]; see also [Doc. 41-3 at 115-16 ¶ 96]. Accordingly, the Court was apprised of the existence of the Cobb County wires and their relevance to the investigation, and in any event, "inadvertent noncompliance with the section 2518(1)(e) disclosure requirement does not mandate suppression." Van Horn, 789 F.2d at 1500.

### d.    Good Faith Exception

The government contends that even if the affidavits in support of the federal wiretaps did not establish probable cause or necessity, suppression of the evidence obtained pursuant to those wiretaps would not be warranted.  [Doc. 41 at 25-27]. Under <u>Leon</u>, 468 U.S. at 897, "the good faith exception to the exclusionary rule 'stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.'" <u>United States v. Vanbrackle</u>, 397 F. App'x 557, 559 (11th Cir. 2010) (per curiam) (unpublished) (quoting <u>United States v. Martin</u>, 297 F.3d 1308, 1313 (11th Cir. 2002)); <u>see also</u> <u>United States v. Robinson</u>, 336 F.3d 1293, 1295-96 (11th Cir. 2003).  The exception is founded on the principle that the exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates," <u>Leon</u>, 468 U.S. at 916; <u>see also</u> <u>Herring v. United States</u>, 555 U.S. 135, 137 (2009) ("The question [of suppression] turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."); <u>Arizona v. Evans</u>, 514 U.S. 1, 14 (1995) (citation omitted) ("The exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees."), and "[p]enalizing the officer for the magistrate's error, rather than his own, [therefore] cannot logically

contribute to the deterrence of Fourth Amendment violations," <u>Leon</u>, 468 U.S. at 921 (footnote omitted). The Eleventh Circuit has recognized that the good faith exception to the exclusionary rule applies to wiretap applications and orders. <u>United States v. Malekzadeh</u>, 855 F.2d 1492, 1497 (11th Cir. 1988); <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1248-49 (N.D. Ga. 2011), adopted at 1168 (citations omitted); <u>United States v. Russell</u>, Cr. No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008), adopted at *1 (citation omitted); <u>United States v. Royster</u>, No. 5:07-CR-16 (WDO), 2007 WL 4336321, at *10 (M.D. Ga. Dec. 7, 2007) (citation omitted); <u>Flores</u>, 2007 WL 2904109, at *7 (citation omitted).[35]

Recognizing that the good faith exception to the exclusionary rule would permit introduction of almost all evidence seized pursuant to judicial authorization, the Supreme Court identified four specific situations in which the exception would not apply: (1) where the warrant or court order is so facially deficient that the

---

[35] "Although the Sixth Circuit has held that there is no good faith exception for a warrant obtained pursuant to Title III, *see United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), the Eleventh Circuit's precedent in *Malekzadeh* is controlling," <u>Booker</u>, 2013 WL 2468694, at *18 n.40 (citations omitted); <u>see also</u> <u>Acosta</u>, 807 F. Supp. 2d at 1248-49; <u>Royster</u>, 2007 WL 4336321, at *10 & n.5. Aguirre-Benitez argues that although <u>Malekzadeh</u> "often is cited for the holding that the <u>Leon</u> good faith exception applies to Title III, the <u>Malekzadeh</u> Court did not so hold, and had it, the Court would have gotten it wrong." [Doc. 36 at 28]. Having carefully reviewed the opinion, the Court "disagrees with [Aguirre-Benitez] and finds that the decision does hold that the good faith exception applies to wiretap orders, as do many of the court's colleagues in this circuit." <u>Acosta</u>, 807 F. Supp. 2d at 1249 (collecting cases). Thus, Aguirre-Benitez's argument is without merit.

executing officers cannot reasonably presume it to be valid; (2) where the issuing judge was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (3) where the issuing judge wholly abandoned his judicial role; and (4) where the supporting affidavit is so lacking in indicia of probable cause or specific and articulable facts relevant and material to an ongoing criminal investigation as to render official belief in its existence entirely unreasonable. Leon, 468 U.S. at 923 (citations omitted); see also United States v. Accardo, 749 F.2d 1477, 1480 & n.4 (11th Cir. 1985). However, Aguirre-Benitez has not advanced any argument as to why the good faith exception would not apply, see generally [Doc. 36], and there is no evidence here that the issuing judges were misled or abandoned their roles as neutral and detached judges, or that the wiretaps so lacked probable cause or were so deficient as to bar the application of the good faith exception, see Acosta, 807 F. Supp. 2d at 1249 (citation omitted) (finding that the good faith exception applied where "[d]efendant set[] forth no grounds supporting a finding that *Leon's* good faith exception d[id] not apply to this case"); Royster, 2007 WL 4336321, at *10 (footnote omitted) ("Defendant [] pointed to no evidence that the law enforcement officers in this case had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, and therefore the good faith

exception would apply even if the Court had not found the surveillance otherwise valid."). Thus, even if the wiretap orders were found to be deficient, law enforcement reasonably relied in good faith on the wiretap orders, and Aguirre-Benitez's motion to suppress with respect to the federal wiretaps is due to be denied for this additional reason. See <u>Acosta</u>, 807 F. Supp. 2d at 1248-49. Accordingly, it is **RECOMMENDED** that defendants' joint motion to suppress the wiretaps, [Doc. 36], be **GRANTED** with respect to the Cobb County wiretaps but **DENIED** in all other respects.

**B.** <u>**Motions to Suppress Evidence, [Docs. 34 & 37]**</u>

Defendants have filed separate motions to suppress evidence obtained from the searches of their respective residences. See [Docs. 34 & 37]. Given the similarity of the arguments contained within their motions, the Court will address both defendants' motions together. Defendants argue that "the affidavits for the search warrants [were] predicated in part on illegally intercepted telephone calls obtained in violation [of] the Fourth Amendment and Title III," and that "[w]ithout that information, there is not sufficient facts for a neutral and detached Magistrate Judge to find probable cause to issue [either] warrant." [Doc. 34 at 5; Doc. 37 at 5]. Defendants claim that the Court "should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with

probable cause to issue [either] warrant." [Doc. 34 at 2; Doc. 37 at 2 (citation and internal marks omitted)]. The government responds that the federal wiretaps and the federal consent wiretaps were proper and that it would not use interceptions obtained from the Cobb County wiretaps as evidence in this case. [Doc. 42 at 10 & n.4]. The government further argues that "even if the evidence from the wiretaps were struck from the affidavits, the affidavits still state sufficient probable cause for a search of the residences," and that "the good faith exception applies, as law enforcement was relying on a warrant issued by a neutral magistrate." [Id. at 10-11 (footnote omitted)].

On March 22, 2017, the Court ordered the government to submit a supplemental response, identifying the portions of the affidavits based on the Cobb County wiretaps. [Doc. 50]. The government filed its supplemental response to defendants' motions to suppress, stating that the following portions of the affidavits reference the Cobb County wiretaps:

A.    4860 Marsha Drive, Mableton, Georgia

•     In the probable cause summary, paragraph D(8), there is a reference to "UM66." Calling the unidentified male "UM66" comes from the Cobb County wiretap labeling system.

B.    91 Park Road, Mableton, Georgia

- In the probable cause summary, paragraph D(8), there is a reference to "UM66." Calling the unidentified male "UM66" comes from the Cobb County wiretap labeling system.

- In the probable cause summary, the section beginning "91 Park Road Mableton, Georgia" contains the following information from the Cobb County Wiretaps: "On January 11, 2015, members of Atlanta HIDTA conducted surveillance in support of intercepted communications between [Aguirre-Benitez] and [W.M.V.]. [Aguirre-Benitez] had agreed to supply [W.M.V.] with methamphetamine."

[Doc. 52 at 3 (internal citations omitted)]. In response, Ramirez filed a brief, arguing that based on the government's supplemental response, the "Cobb County wires are the sole identifying source for the identification of 91 Park Road" and that "every reference to and surveillance of this location came as a result of information gained from the [Cobb County] wire[tap]s and therefore all subsequent evidence gained is fruit of the poisonous tree." [Doc. 53 at 3-4].

**1.** *Probable Cause*

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga.

Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013). That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted). "Probable cause deals 'with probabilities[] [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015), aff'd, 649 F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citation omitted). Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. (citations omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014). Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States

v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

Defendants contend that the affidavits submitted in support of the warrants to search their residences use information from illegal wiretaps and that without this information, the affidavits fail to establish probable cause to justify the search. [Doc. 34 at 1-2; Doc. 37 at 1-2]. Neither defendant specifies which wiretaps they claim are illegal. See [Docs. 34 & 37]. However, as the government points out, "the affidavit in support of the search of 4860 Marsha Drive references interceptions from federal wiretaps TT#1, TT#2, and TT#3," and "does not reference interception from the federal consent wiretaps or the Cobb County wiretaps," [Doc. 42 at 10 n.2], except that the identification of an unidentified male as "'UM66 [in the probable cause summary] comes from the Cobb County wiretap labeling system," [Doc. 52 at 3]. In addition, the affidavit in support of the search of 91 Park Road "does not reference interceptions from the federal consent wiretaps," but it does reference interceptions from federal wiretap TT#2 and an interception . . . from a Cobb County wiretap." [Doc. 42 at 10 n.3].

With respect to the reference to the federal wiretaps in the affidavits submitted to obtain the state search warrants, the Court has already addressed and rejected the argument that the federal wiretaps violated Title III in the discussion of

the joint motion to suppress wiretaps, finding that the federal wiretaps in this case were lawful and proper. As for the federal consent wiretaps, the government has affirmed that neither affidavit references the federal consent wiretaps, [Doc. 42 at 10 nn.2-3], and defendants have not argued to the contrary.[36]

Both affidavits reference "UM66," see [Docs. 42-1 & 42-2], and the government has represented that identification of the unidentified male as "UM66" in the affidavits came from the wiretap labeling system of Cobb County, [Doc. 52 at 3]. Ramirez argues that every use of the label "UM66" should be struck from the affidavits. [Doc. 53 at 3]. However, the mere use of "UM66" to label the unidentified male that agents had observed in their investigation of the drug

_____

[36] And even if the affidavits for the state search warrants had referenced the federal consent wiretaps, it would provide no basis to support defendants' arguments since the preceding discussion demonstrates that there was no violation of Title III with respect to the federal consent wiretaps. Moreover, Ramirez has since withdrawn his position in the joint motion to suppress wiretaps with respect to the federal wiretaps and the federal consent wiretaps. See [Doc. 54]. Thus, to the extent his motion to suppress the search of his residence is based on the inclusion in the affidavit of information from either the federal wiretaps or the federal consent wiretaps, his motion is due to be denied. See United States v. Scasino, 513 F.2d 47, 50-51 (5th Cir. 1975) (footnote omitted) (citing Alderman v. United States, 394 U.S. 165, 171-76 (1969)) (finding that because none of the defendants were "'aggrieved persons' of the [] wiretap, [] they [were] precluded from asserting its illegality" and that "since one cannot assert indirectly what he cannot assert directly, defendants ha[d] no standing to suppress evidence obtained from the [] wiretap or from the January, 1972, search as evidence derived from an illegal wiretap"). Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

trafficking organization was not a reference to information intercepted through the Cobb County wiretaps.[37] In fact, the only reference to information obtained from the Cobb County wiretaps is contained in the probable cause summary for the affidavit in support of the warrant to search 91 Park Road, see [Doc. 52 at 3]; see also [Docs. 42-1 & 42-1], which states: "On January 11, 2015, members of Atlanta HIDTA conducted surveillance in support of intercepted communications between [Aguirre-Benitez] and [W.M.V.]. [Aguirre-Benitez] had agreed to supply [W.M.V.] with methamphetamine," [Doc. 42-2 at 10].

Defendants argue that the Court should excise the "tainted evidence" and then determine whether the remaining evidence establishes probable cause. [Doc. 34 at 2; Doc. 37 at 2]. Even were the entire drug transaction observed by agents on January 11, 2015, excised from the affidavit, the remainder of the allegations in the affidavit would still provide probable cause for the search of 91 Park Road. As previously noted, "the issuing [judge] is simply to make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit, there is a fair probability of finding evidence of a crime." United States v. Grant, Criminal

---

[37] Moreover, striking from the affidavit every reference to the label "UM66" does not alter the substance of the information about the investigation that established probable cause to support the search warrant because the use of "UM66" to identify the person agents observed was simply a labeling system employed by Cobb County.

Action No. 1:09-CR-482-TWT-LTW, 2011 WL 2580867, at *12 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2580779 (N.D. Ga. June 29, 2011), aff'd, 521 F. App'x 841 (11th Cir. 2013) (unpublished). The remaining allegations of the affidavit show that the same unidentified male connected to the drug trafficking organization was at 91 Park Road before and after suspected drug transactions on January 8, 2015, and this location was believed to be used as his residence based on telephone location data and physical surveillance.[38]  [Doc. 42-2 at 8-11].  And, Officer Patten averred in the

---

[38] Ramirez argues that the "Cobb County wires are the sole identifying source for the identification of 91 Park Road, every reference to and surveillance of this location came as a result of information gained from the suppressed wires and therefore all subsequent evidence gained is fruit of the poisonous tree." [Doc. 53 at 3-4]. Ramirez further argues that the "only reason this address was discovered was due to information gleaned from the Cobb County wiretaps," that led to surveillance of an exchange on January 11, 2015, after which agents followed UM66 to 91 Park Road. [Id. at 4]. While Officer Patten did state that this surveillance led to the discovery of this address, [Doc. 42-2 at 10], the affidavit reveals that agents actually first connected UM66 to 91 Park Road on January 8, 2015, during the surveillance of M.W. when agents followed an unidentified male, labeled as UM66, back to 91 Park Road after he was believed to have delivered drugs to M.W. and then again followed him to 34 Acacia Lane, where he stayed only 8 minutes, and then to 1977 Corner Road Powder Springs, where it was believed he delivered drugs to J.M., [id. at 9]. In fact, agents had been monitoring the activities of UM66 and Aguirre-Benitez in connection with the drug trafficking organization since April of 2014 on an almost daily basis and had identified multiple locations in Cobb County, Georgia that were believed to be used to support the drug trafficking organization. [Id. at 8]. Thus, Ramirez's assertion that the Cobb County wiretaps were the only reason his residence was identified is incorrect, but considering only the facts alleged in the affidavit in connection with the events of January 8, 2015, and in light of the other evidence in the affidavit regarding the drug trafficking organization's activities apart from the Cobb County wiretaps, there was sufficient probable cause to support the search warrant for Ramirez's residence.

affidavit that drug traffickers often hide evidence of their drug sales in their residences. [Id. at 7, 11]. Thus, "the remaining allegations of the affidavit independently show that there was a fair probability of finding evidence of [drug trafficking at 91 Park Road]." Grant, 2011 WL 2580867, at *12. Considering the information obtained from the federal wiretaps that was properly included in the affidavits, but excising the information actually obtained from the Cobb County wiretaps, the affidavits in support of the state search warrants were still supported by probable cause, and defendants' motions to suppress searches of their residences based on the affidavits containing "illegal wiretaps," [Doc. 34 at 2; Doc. 37 at 2], are due to be denied.

### 2. *Good Faith Exception*

Even if the search warrants in this case were found to be invalid, suppression of the evidence seized from the residences would not be warranted because the officers executing the warrants reasonably relied in good faith on the validity of the warrants. See Leon, 468 U.S. at 897. Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate.'" United States v. Sharp, Civil Action File No. 1:14-cr-229-TCB, 2015 WL 4641537, at *14 n.18

(N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also

Robinson, 336 F.3d at 1295-96.  As previously mentioned, there are four exceptions

to the Leon good-faith exception doctrine:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

Martin, 297 F.3d at 1313 (citation and internal marks omitted).

Defendants argue that the good faith exception does not apply in this case

because the affidavits included evidence obtained from illegal wiretaps.  [Doc. 34 at

2–3; Doc. 37 at 2-3].  To support their argument, defendants cite United States v.

McGough, 412 F.3d 1232, 1236-40 (11th Cir. 2005), and United States v. Vasey, 834

F.2d 782, 789 (9th Cir. 1987).  [Doc. 34 at 2–3; Doc. 37 at 2-3].  In McGough, officers

entered the defendant's home without a warrant, his consent, or exigent

circumstances, and the officers then used what they saw inside the home to seek a

search warrant.  412 F.3d at 1240.  The Eleventh Circuit found that because this "was

not an 'objectively reasonable law enforcement activity,'" the exclusionary rule

applied.  Id.  In Vasey, the officer conducted an illegal warrantless search and presented the evidence obtained in that search to a magistrate judge to obtain a search warrant.  834 F.2d at 789.  The Ninth Circuit found that the good faith exception did not apply to the facts in that case.  Id. at 790.  However, as the government correctly argues, these cases are distinguishable from the two search warrant affidavits in this case as "evidence from the wiretaps was obtained pursuant to court-authorization" and law enforcement was thus "acting in good faith" when using the information gathered from the wiretaps in the affidavits in support of the search warrants for the residences.  [Doc. 42 at 20].

In addition, there is no evidence here that the issuing judges were misled or abandoned their roles as a neutral and detached judges, or that the warrants so lacked probable cause or were so deficient as to bar the application of the good faith exception.  See United States v. Cray, 673 F. Supp. 2d 1368, 1380 (S.D. Ga. 2009), adopted at 1371 (finding evidence discovered as a result of a contested search warrant was admissible under the good faith exception because there was no evidence that "the magistrate judge 'wholly abandoned' his detached and neutral role in issuing the warrant," that "the warrant was in any way 'facially deficient' such that the executing officers could not reasonably presume its validity," or that "the warrant was so lacking in indicia of probable cause so as to render belief in its

existence entirely unreasonable"). Therefore, even if the search warrants were found to be deficient, law enforcement reasonably relied in good faith on the warrants, and defendants' motions to suppress the searches of their residences are due to be denied on this alternative basis. See United States v. Henry, No. 16-13009, 2017 WL 1031147, at *1 (11th Cir. Mar. 17, 2017) (per curiam) (unpublished). Accordingly, it is **RECOMMENDED** that defendants' motions to suppress the searches of their residences, [Docs. 34 & 37], be **DENIED**.

## III. CONCLUSION

For the foregoing reasons, Ramirez's motion to withdraw his position in the joint motion to suppress with respect to the federal wiretaps and the federal consent wiretaps, [Doc. 54], is **GRANTED**, and it is **RECOMMENDED** that defendants' "Joint Motion to Suppress Wiretaps," [Doc. 36], be **GRANTED IN PART** and **DENIED IN PART** and that the defendants' motions to suppress evidence from the searches of their residences, [Docs. 34 & 37], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case other than the government's representation that a superseding indictment may be forthcoming, but it has not yet been returned by the grand jury.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 21st day of April, 2017.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE